UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Lakeview Management, Inc.;
Lakeview Neurorehabilitation
Center, Inc.; and Lakeview
Neurorehab Center Midwest, Inc.,
    Plaintiffs

    v.                         Civil No. 07-cv-303-SM
                                  Opinion No. 2009 DNH 036
Care Realty, LLC; and
THCI Company, LLC,
    Defendants

## MEMORANDUM DECISION

Plaintiff Lakeview Management, Inc. ("LMI") owns Lakeview Neurorehabilitation Center, Inc. ("LNC") and Lakeview Neurorehab Center Midwest ("LNC-M").  LNC, in turn, operates a neurological rehabilitation center in Effingham Falls, New Hampshire, while LNC-M operates a neurological rehabilitation center in Waterford, Wisconsin.  Both centers are operated in facilities owned by and leased from defendants, Care Realty, LLC ("Care") and THCI Company, LLC ("THCI").  For ease of reference, the Lakeview entities shall be referred to collectively as "Lakeview" or "Lessee," and defendants as "THCI" or "Lessor."

In 1997, LNC and LNC-M entered into identical amended and restated lease agreements with THCI's predecessor, Meditrust of New Hampshire, Inc. ("Meditrust") entitling them to occupy and operate the facilities in New Hampshire and Wisconsin.  In April

of 2001, THCI acquired and assumed all of Meditrust's rights and obligations under those Leases.[1]  This dispute arises from the contractual relationship between the parties as embodied in the Lease.

The Lease was for a "Fixed Term" of ten years, terminating on September 30, 2007, but subject to Lakeview's unilateral right to extend the term for three successive periods of five years each.  Lakeview could exercise its option to extend the term by giving THCI written notice "of each such extension" within a defined time window — at least 180 days, but not more than 360 days, before expiration of the Fixed Term (or an extended term).

At issue in this case, fundamentally, is whether Lakeview validly extended the Lease term, such that it is contractually entitled to occupy and operate the facilities for another five years, and, if it did validly extend, whether it subsequently repudiated or terminated that extended contract.

---

[1]  Identical Leases were entered into with respect to the facilities in Wisconsin and New Hampshire.  The Leases are inter-related though separate.  The court's jurisdiction is based on diversity of citizenship, and New Hampshire law generally governs disposition of the issues presented, although Wisconsin's applicable statute of limitations will be applied with respect to the Wisconsin Lease.  For ease of reference and discussion, the Leases will be treated as if there was only one.

The business relationship between these parties began to deteriorate within a short time after THCI purchased the properties, and, as the Lease term progressed, that relationship became increasingly strained.  There were a number of reasons for the decline, but, at bottom, each side seemingly misapprehended its legal rights and responsibilities, and also frequently misapprehended what the other was attempting to communicate. Each side viewed the relationship through its own peculiar filter, generally talking over the other, often at cross-purposes.  Perhaps intentionally, perhaps not.  The resulting factual record is somewhat convoluted and difficult to sort out, but while the record is lengthy and exhibits numerous, the dispute can be resolved by resort to familiar principles of contract law and equity.

The case was ably tried to the bench and has been fully argued and briefed by capable counsel.  This memorandum decision sets out the court's findings, rulings, and conclusions.

**Factual Background**

A fairly thorough review of the pertinent factual circumstances, including the court's findings of fact, is necessary to a discussion of the legal issues presented.

Before acquiring the Lakeview facilities from Meditrust, and as part of its due diligence inquiries, THCI obtained an executed Tenant Estoppel Certificate from Lakeview (Ex. F 6).  In that certificate, among other things, Lakeview affirmatively represented to THCI that "[t]he methodology for computing Additional Rent[2] under the Lease is set forth in Section 3.1.2 of the Lease."  Notwithstanding its representations in the Tenant Estoppel Certificate, Lakeview had not calculated Additional Rent in conformity with the Lease's definition of Gross Revenues since December of 2000 (i.e., before THCI acquired the property, in April of 2001).

Lakeview principals testified that Meditrust, the former owner, had agreed to an oral modification of the Lease that redefined the term "Gross Revenues" to mean Gross Revenues as understood when applying Generally Accepted Accounting Principles ("GAAP"), rather than as defined in the Lease.  The difference

---

[2]  "Additional Rent" is a component of the total rent payable to THCI, consisting of "an amount equal to fifteen percent (15%) of Rental Net Income."  (Ex. M 22.)  "Rental Net Income" is defined as "the amount equal to the Net Income from the Facility and all of the Related Facilities [NH and WI] . . . adding back depreciation, amortization, Additional Rent and management fees in excess of five percent (5%) of Gross Revenues."  (Id.)  "Gross Revenues" has a specific meaning under the Lease, as defined in Section 2.1 (Ex. B 1), and essentially includes all revenues received less contractual allowances (id.).

was significant; using GAAP Gross Revenues meant Lakeview would enjoy a significant reduction in Additional Rent owed.[3]

The evidence of an agreement between Meditrust and Lakeview to change the Gross Revenues definition consisted almost entirely of testimony from Lakeview principals — testimony generally lacking in specificity.  Lakeview's accountant corroborated that testimony after a fashion, saying that the change in accounting for Gross Revenues predated THCI's acquisition, and was based on her own understanding (she was told) that an agreement had been reached.  One Lakeview principal testified that the agreement had been reduced to writing in the form of an "estoppel agreement," but Lakeview's accountant could not find it among her records, and no such written agreement was found among Meditrust or THCI records, and it was not produced at trial.  Lakeview principals also suggested that THCI should have known that it was using GAAP Gross Revenues to calculate Additional Rent before it acquired the properties, claiming that anyone familiar with commercial lease accounting (like THCI) would recognize, from even a cursory

---

[3]  Gross Revenues calculated under GAAP would be larger than those calculated under the Lease definition, which in turn would result in a lower Additional Rent payment to the Lessor.  That is, management fees in excess of 5% of GAAP Gross Revenues would be <u>less</u> than management fees in excess of 5% of Lease-defined Gross Revenues, so, when that amount is added back to the Rental Net Income, it would also be lower, and the Additional Rent calculation (15% of the lower Rental Net Income) would be concomitantly lower.

review of routinely submitted financial reports, that Lakeview
was not using the Lease definition of Gross Revenues when
calculating Additional Rent, despite representations to the
contrary in the Tenant Estoppel Certificate.

Shortly after taking ownership of the facilities, THCI
(Warren Cole, a THCI principal, and his staff) did realize that
Additional Rent was being calculated differently than called for
under the Lease.  THCI raised the issue informally with Lakeview,
but Lakeview continued to calculate Additional Rent in the same
manner.  THCI did not acquiesce in what it considered an
incorrect calculation, but neither did it press the issue or take
formal action to resolve the dispute.

Almost three years after THCI bought the facilities, it more
formally notified Lakeview, in writing, that it disagreed with
the manner in which Lakeview was calculating Additional Rent,
thought it was owed at least $500,000 in underpaid Additional
Rent, and was considering an audit, as allowed under the Lease,
to determine the variance between what was due and what had been
paid.  (Ex. M 20.)  Lakeview responded that it thought its
calculations were correct, asserting that Meditrust had agreed to
its method and that THCI had waived any objection, noting that
THCI had accepted Additional Rent payments since it acquired the
property, with knowledge of Lakeview's use of a different

6

definition of Gross Revenues.  (Exs. M 21, M 22.)   THCI demurred
and estimated that Lakeview owed some $680,000 in back Additional
Rent.  (Ex. M 23.)   The parties moved on to other concerns and,
for the next few years, seemed to tacitly agree to disagree about
the Additional Rent issue and whether Lakeview was in default.
Neither party brought it up as an issue, nor took steps to
resolve the matter.

Shortly after THCI succeeded Meditrust as Lessor, Lakeview
expressed an interest in negotiating better Lease terms for
itself.  In 2006, Lakeview pressed harder for negotiations aimed
at amending the Lease terms, noting that the Fixed Term was
coming to an end the next year.  But nothing substantive came of
those efforts.  Lakeview expected to reach an agreement of some
kind before it had to exercise its option to extend, and it
continued to pursue that goal.  THCI understood the time issue —
the window during which Lakeview's option could be exercised
would close on March 30, 2007.  On October 18, 2006, Warren Cole
e-mailed Michael Torzilli, the THCI employee in direct contact
with Lakeview:

> Also we need to move Lakeview along.  [A]t some
> point they are going to invoke their renewal and
> appraisal process.  I think we want to trump that.
> Remember, they can[']t exerci[s]e that if they are in
> default.  Perhaps its time to call them in default on
> the percentage [Additional] rent.

(Ex. L 754.)  Notwithstanding Cole's suggestion, THCI did not call Lakeview in default on the Additional Rent issue until it filed its counterclaim in this suit.

The next month, on November 15, 2006, Lakeview wrote to THCI regarding its Lease option:

> In connection with the above-referenced Lease, the <u>Lessee hopes to extend the term of the Lease</u> for an additional five-year period, and the <u>Lessee very much looks forward to continuing its relationship with the Lessor</u>.  <u>However, before giving formal written notice of its intention in that regard pursuant to Article 1.4,</u> Lessee would appreciate the opportunity to discuss with you the revision of a handful of provisions.

(Ex. L 757 (emphasis added).)

Plainly, Lakeview did not effectively exercise its option by that letter, but it did put THCI on notice that it anticipated doing so, while simultaneously inviting THCI to discuss amendments to the Lease before Lakeview made its decision.  Over the next few months, Lakeview kept asking for amendment discussions, but without much success.  (Exs. L 759, L 805, L 806, L 831.)  THCI's response was usually the same — "we're reviewing the matter."  (<u>Id</u>.)

Lakeview's option rights are set out in Article 1.4 of the Lease, which provides:

8

1.4 <u>Extended Terms</u>.  Provided that this Lease has not been previously terminated, and **so long as no lease default (as hereinafter defined)** shall have **occurred and be continuing**, Lessee is hereby granted the right to extend the Fixed Term of this Lease for three (3) additional periods (collectively, the "Extended Terms") as follows: three (3) successive five (5) year periods for a maximum Term, if all such options are exercised, which ends on September 30, 2022.  **Lessee's extension rights shall be exercised by Lessee by giving written notice to Lessor of each such extension** (the "Extension Notice") **at least one hundred eighty (180) days, but not more than three hundred sixty (360) days, prior to the termination of the Fixed Term** or then current Extended Term.  Lessee may not exercise its option for more than one Extended Term at a time.  During each effective Extended Term, **all of the terms and conditions of this Lease shall continue in full force and effect, except that the Base Rent for each such Extended Term shall be the greater of** (a) **the fair market value rent** for the Leased Property at such time, **to be determined by an appraisal** of the Leased Property performed by an appraiser mutually acceptable to the Lessor and the Lessee, as of the first day of each of the Extended Terms **or** (b) **the Base Rent in effect immediately prior to the expiration of the preceding term**.  Said Base Rent shall be determined concurrently with the Lessee's giving of the Extension Notice to the Lessor.

(Ex. B (bold type and underscoring added for emphasis).)

As the deadline for exercising its option to extend approached, Lakeview intensified its effort to renegotiate the Lease terms.  THCI remained generally unresponsive.  THCI was not inclined to reduce the rent, but, rather, wanted to substantially increase it.  Lakeview was seeking lower rent and was not likely to pay more than it would be required to pay if it exercised its option to extend the term.  THCI could have been more candid

about its position, but, then, it appears to have already begun
thinking that Lakeview would not continue as its tenant.

Certainly, THCI was not anxious for Lakeview to exercise its
option.  During an extended term, the rent would either remain
the same or increase only to the level of prevailing market
rates, after an appraisal process.  But, given the widespread
decline in the real estate market, combined with increasing cost-
controlling pressures from the states — the primary payors for
the rehabilitative services provided at the facilities — an
appraisal may not have resulted in any increase in the rent
Lakeview was paying.  Nevertheless, the appraisal process
provided for in the Lease could only work to THCI's advantage —
the rent would either remain as it was, or it would go up if
market values were higher.  Rent would never go down, no matter
how depressed the market at the time of option exercise.
Consequently, Lakeview had no incentive to insist on an
appraisal.  THCI did, but declined to do so when that process was
later invoked by Lakeview.

In any event, notwithstanding its lack of success in
negotiating better terms, Lakeview was not so lulled into
somnolence by THCI's unresponsiveness that it neglected to
exercise its option within the prescribed time window.  Given the

10

fast–approaching deadline, Lakeview gave written notice of its

exercise of the option to extend, in writing, on March 16, 2007:

> Pursuant to Article 1.4 of the above-referenced
> Lease, notice is hereby given that Lessee intends to
> extend the term of the Lease for an additional five-
> year period.  We would appreciate your continued
> consideration of the matters addressed in our
> correspondence of November 15, 2006.
>
> Should any further notice of Lessee's intent to
> extend the term of the Lease be required, please
> contact us at your first convenience.  Thank you for
> your attention to this matter, and we look forward to
> continuing our relationship with you.

(Def. Exs. M 8, L 833.)

THCI did not misunderstand the import of Lakeview's notice,

or perceive any ambiguity in its message.  On March 28, 2007,

employees of THCI involved in managing the Lakeview properties

engaged in the following e-mail exchange in which they recognized

that the option was exercised, but contemplated a potential

challenge to that exercise.

> Breslin:       Has Lakeview exercised their option to
>                extend the Lease?  Please advise.  Thank
>                you.
>
> Torzilli:      They have asked <u>to be allowed to extend</u>,
>                yes.
>
> Breslin:       <u>With no conditions so they have
>                extended</u>, or will we contest the
>                extension due to the nonpayment of
>                excess rent or some bs[4] like that?

---

[4]  Breslin humorlessly, and not very credibly, claimed at
trial that he did not know what "bs" meant.

11

| Torzilli: | <u>We will contest</u> since they are in default on the percentage rent [Additional Rent] <u>and try to use that to negotiate a new rent/lease</u>.  I will have a proposal for what we should do there by Friday (or Monday). |
| Breslin: | Ok.  If you were Bob, would you consider it extended. |
| Torzilli: | <u>Yes</u>. |

(Ex. L 834 (emphasis added).)

THCI (Torzilli) sent a letter to Lakeview on April 16, one month after the option was exercised, in which THCI acknowledged Lakeview's March 16 notice "purporting to exercise certain extension options in the Lease."  THCI "reserved all rights" with respect to Lakeview's right to extend.  The period during which the option could be exercised had expired more than two weeks earlier.

THCI, as seemed to be its habit, chose its words carefully, seemingly more for the purpose of keeping all options open than in candidly disclosing its position.  THCI did not declare in its April 16 letter that it would not perform under the Lease as extended, but did not say it would.  It did not dispute the validity of the option's exercise, nor did it acknowledge that the option had been validly exercised.  It did not explicitly declare the option exercise invalid due to a continuing Lease default, it merely observed that a breach of the Lease (and an

"Event of Default") existed due to Lakeview's failure to pay the full amount of Additional Rent due, dating back to 2001.

Having "reserved its rights" with regard to the option's exercise, THCI also finally responded to Lakeview's request to discuss Lease amendments.  In Torzilli's April 16 letter, THCI outlined some basic terms it proposed "for Lessee's renewal of the Leased Property."  It was an imaginative proposal, to be sure, and was consistent with THCI's intent to "try to use [the Additional Rent default] to negotiate a new rent/lease." (Ex. L 834.)  THCI proposed, among other things, a new base rent that was significantly higher than that called for in Lease provisions related to extensions, as well as payment by Lakeview of roughly $1.4 million to resolve THCI's claim of Additional Rent arrearages over the previous six years.

Lakeview was "a bit taken aback with the proposed new terms and amount[,] not to mention the allegation . . . [of] breach." (Ex. L 875.)  Given THCI's attention-getting proposal for amendments to the Lease, or a new contractual relationship entirely (it is unclear precisely what THCI meant), Lakeview invoked the Lease's appraisal process with regard to establishing rent during an extended term:

> In the meantime, we do believe that based on what
> you feel current value of the property is, as evidenced

13

> by the 70% rental increase, we need to move on getting
> fair market real estate appraisals.  We had hoped that
> we could avoid the costly appraisal step.  We have
> identified the certified appraisers in both areas [NH
> and WI] and if you could identify 5 that we could
> choose from we should have a mutually agreed upon
> appraiser, attached is the list.

(Ex. L 875.)  THCI never agreed to an appraiser or the process.


Lakeview continued its efforts to have a meaningful dialogue with THCI about the Lease situation.  (See Ex. L 935.)  But its principals seemed both unrealistic and naive in expecting an agreement more favorable than the existing Lease, or even one markedly less unfavorable than had been proposed by Torzilli. For reasons best known to them, they continued to anticipate a mutually satisfactory agreement of some kind, notwithstanding all the signs that THCI was proceeding on the assumption that the Lease would either expire on September 30, by which time Lakeview would either agree to terms dictated by THCI or would be replaced.  Presumably, at some point, THCI intended to declare Lakeview's exercise of the option invalid.  Although a meeting was held in June of 2007, and the parties corresponded throughout the summer months, no progress was made on an agreement to amend the Lease terms.  Growing frustration on Lakeview's part began to show itself in e-mail exchanges.  (See, e.g., Exs. L 946, L 958.)


On July 27, 2007, the following e-mail exchange occurred between Cole and Torzilli:

14

| Cole: | At some point you will have to remind [Lakeview] that they owe us $1,800M dollars.  Are they personal for that?  That alone should get us the stock in the business. |
|---|---|
| Torzilli: | I want to speak to them first to make sure they fully understand our proposal.  <u>Then I will hit them with the addition rent claim</u>. |

(Ex. L 937 (emphasis added).)  As that exchange illustrates, THCI had not yet, in its own view, actually declared the Additional Rent calculation to be a "Lease Default" precluding exercise of the option to extend.

By early August of 2007, THCI recognized that Lakeview principals were "growing more hostile and the time-frame is so short," a reference to the dwindling time available to obtain the state licenses and permits that would be necessary if THCI took over the facilities and operations.  THCI began planning for a potential assumption of operations, noting that "we also need to get some litigators going on this."  (Ex. L 960.)  Breslin e-mailed Torzilli on August 3 asking:

Are we sure we are in for a fight?  I thought they offered to throw us the keys?

(Ex. L 961.)

On August 17 Lakeview e-mailed THCI:

          After all the back and forth it is clear that we
     are unable to come to an agreement regarding an
     extended term.

                         *     *     *

     <u>As provided for in our current Lease</u>, <u>we are prepared</u>
     <u>to exercise our option to renew the Lease for a five</u>
     <u>year term at the current Lease rate</u>.  We are unwilling
     to and unable to agree to the proposed increase in rent
     for a ten year term, and we cannot wait any longer to
     resolve this issue.  <u>We are forced to proceed on the</u>
     <u>assumption that you have not accepted our offer to</u>
     <u>extend for the next five years</u>.  We intend to initiate
     immediate notifications to all affected parties; as
     required by regulatory agencies and consumer contracts.

(Ex. L 962.)  That e-mail caused THCI to consider its position

with respect to possibly offering a different proposal.  (<u>See</u>

Exs. L 964, L 968.)  Discussions followed, but again little

progress was made.


     As illustrated by the August 17 e-mail, Lakeview's

principals were operating under a fundamental misunderstanding of

its rights under the Lease:  they were apparently unaware that an

option constitutes an <u>irrevocable</u> <u>offer</u> <u>by</u> <u>the</u> <u>optionor</u> (<u>i.e.</u>,

THCI), and not an offer by the optionee that must be accepted by

the optionor.  Consequently, Lakeview failed to understand that

it had successfully exercised its option and the Lease term was

extended for five years, beginning on October 1, 2007.  Instead,

Lakeview thought that, absent THCI's acknowledgment or acceptance

of its option exercise, it would be dispossessed at the

expiration of the initial term, on September 30.  Given that

                              16

fundamental misunderstanding, Lakeview experienced a great deal
of pressure, since it was required by regulatory agencies to give
advance notice of any change in licenses or ownership, and was
required to plan for the continuity of care of Lakeview's
vulnerable, brain-injured population, either by transition to a
new operator, or placement in different facilities.  In
Lakeview's view, time was indeed short.  Accordingly, Lakeview
wrote to THCI on August 21:

> To follow up on our phone conversation, we need a
> final decision by the end of the day.  If renewal is
> not the decision, beginning tomorrow we feel the focus
> must be on transition planning and execution.  We must
> infuse a smooth change of ownership [sic] due to the
> complexities of the operations and patient population.

(Ex. L 975.)

Given THCI's pattern of unresponsiveness, Lakeview insisted
that a response be provided to its "offer" (however inartfully
expressed) to perform its contractual obligations under the
Lease, as extended.  (See Ex. L 962.)  THCI (Torzilli) replied
that it was "still evaluating their proposal."  (Ex. L 976.)

THCI was again slow to respond.  (Ex. L 1002.)  Lakeview
reasonably insisted upon an answer to its latest proposal —
essentially that it was ready, willing and able to perform under
the Lease as extended.  Lakeview set a deadline of 5 PM on August
22 for THCI's response:

> As discussed, the final deadline for resolution of
> any future role for us at these facilities, or
> alternatively commencing regulatory notification and
> winding up activities is 5 PM today.

(Ex. L 1002.)

THCI ignored the deadline Lakeview set.  It neither

acknowledged Lakeview's rights under the exercised option, nor

disclosed its view that Lakeview was not entitled to an extended

term, due to an invalid exercise of the option.  At 5:03 PM on

August 22 Lakeview wrote THCI:

> Please accept this e-mail as notification that the
> deadline has past [sic] and we regret that we were
> unable to work out the Lease extension.  Therefore, we
> need to immediately move forward with the required
> notifications.  We will work with you <u>on the transition</u>
> and <u>need to outline that plan</u> as soon as possible!

(Ex. L 1021 (emphasis added).)  That e-mail, fairly construed,

represented Lakeview's not unreasonable conclusion that THCI, as

owner, would not suffer Lakeview's continued occupation and

operation of the facilities after expiration of the Fixed Term on

September 30.  Lakeview's conclusion was understandable given

THCI's unresponsiveness and its refusal to acknowledge, much less

communicate its own intent to perform under, the Lease as

extended by the option's exercise, or, for that matter, to

declare its position that the option had not been validly

exercised.  Given that situation, and the obligations, both legal

and ethical, that Lakeview owed its patients and its regulators,

18

Lakeview declared its intent to begin the required licensure notifications (and patient discharge planning), and it assumed there would be a transition of responsibility for the operations, rather than a complete shut-down (which would require patient placement arrangements).

Importantly, however, Lakeview did not clearly and unequivocally declare a repudiation of the Lease — either the Fixed Term, or as extended.  It responsibly expressed an intent to meet its legal and ethical obligations under pressures resulting in large part from THCI's unresponsiveness and the inferences Lakeview plausibly drew from that unresponsiveness.

The next day, August 23, Lakeview sent THCI two e-mails. The first reiterated Lakeview's regret that the parties were not able to work out an extension acceptable to both, and went on to state:

> Upon (or prior to) the expiration of the term, we intend to vacate and surrender the leased property in compliance with the agreement.  Further, in accordance with the Lease agreement, we intend to fulfill all our obligations in connection with the surrender of the leased property, including for example, the transfer and assignment of contracts and permits as allowable and necessary for the properties continued operation. To satisfy our obligations under law and the agreement, we will work with you to implement and execute a plan for the transition, but we must communicate with you to minimize the impact to the business!!!

(Ex. L 1027.)   About six hours later, Lakeview sent another e-mail to THCI stressing that it was required to give a thirty-day notice to patients, guardians, and the New Hampshire Bureau of Health Facilities Administration, that it "[had] not been able to extend their physical plant Lease beyond October 1, 2007," (Ex. L 1029 (emphasis added)), putting THCI on notice, again, that Lakeview was acting on the premise that THCI would not permit its continued tenancy.   Lakeview again pointed out the time constraints applicable to changing operations with respect to licenses, etc., and clarified what its proposed "transition" involved.

Lakeview's proposed transition consisted of an offer of full resolution of the contractual relationship between it and THCI, including contract disputes.   The two e-mails, in context, communicated Lakeview's understanding that THCI would not permit Lakeview to perform under the Lease after September 30 and that the parties could not agree on terms of a new contractual relationship.   Accordingly, Lakeview was offering to resolve all disputes and the contractual relationship itself on the following proposed terms:

> 1)  As contemplated by the Lease's terms when a term
> expires, and in the interests of its patients and in
> compliance with its regulatory and ethical obligations,
> Lakeview would fully cooperate in a transition of
> operations to THCI, or a new Lessee.

2)  Lakeview would continue to manage the facilities
after September 30, 2007, as necessary to ensure a
smooth operational transition, if THCI agreed to retain
those services, for a management fee of 5% of Gross
Revenue (presumably as understood with reference to
GAAP);

3)  THCI would provide the working capital necessary to the
operations as of October 1, 2007;

4)  "[THCI] will agree to the fair market asset buyout;"

5)  "[THCI] or its designee and Lakeview Management
shall execute mutual releases (no recourse for any past
accusations);"

6)  "[THCI] would provide an experienced operator for
Lakeview to work with during the transition."

(Ex. L 1029 (emphasis added).)

The two e-mails sent on August 27, read together and in

context, offered THCI a contract acceptable to Lakeview that

would resolve both the Lease relationship, including all disputes

under the Lease, as well as provide for a smooth and effective

transition of operations to THCI or another Lessee over a

reasonable time period.  It also provided that THCI would buy

Lakeview's business (i.e., a "fair market asset buyout").  THCI

(Torzilli) responded reasonably quickly on that occasion — in

just over an hour — but with a familiar refrain:

"We are reviewing the below [proposal].  We will get
back to you by tomorrow afternoon, but in the interim,
no action should be taken regarding the discharge of
patients."

(Ex. L 1037 (emphasis added).)  That is, THCI was considering the offer, and was concerned that steps leading to a shut-down of the operations (discharge of patients) not be taken.  Lakeview acknowledged Torzilli's response within the hour:

> . . . as discussed, we will assist as needed to get you whatever will help us transition these programs.  We expect that you will get back to us in writing as to [THCI's] intent to continue our services until they have secured the appropriate licenses and have a competent operator in place.
>
> *     *     *
>
> Both parties will have to involve legal [i.e. attorneys] ASAP to complete legal documents that bind us to the terms [of our proposal] by mid week in order to preclude our requirement to notify patients, clients, guardians and families.  Time has run out and if we know we are not going to be in an interim operational position on October 1, and there is a potential that the buildings will be unlicensed, we will have no choice but to begin the notification process to patients, clients, guardians and families pursuant to the licensing rules.  Discharge planning on these difficult clients is going to be enormous and we need time to find the most appropriate placements.

(Ex. L 1040 (emphasis added).)

The next day, August 24, Lakeview referred to the asset purchase term of its proposal, noting that "the asset purchase does not include the names, licenses, intellectual properties[,] goodwill, etc."  Once again, THCI was slow to respond.  So, three days later, on August 27, Lakeview sent a prodding e-mail to THCI (Torzilli):

> We have not heard a word from you!!!  Is the
> expectation that we are to work toward discharging the
> patients and emptying the buildings as required by law
> if there is not a qualified licensee identified to take
> over when we exit?  Your radio silence is unacceptable
> — we are talking about the welfare of real people
> here!!  Are Warren or Daniel [THCI principals]
> available for a phone call?  Thanks.

(Ex. L 1152.)  THCI responded within minutes:  "We will be

sending you a response via e-mail and letter by the end of

business today."  (Ex. L 1153.)


Warren Cole, when he saw the e-mail from Lakeview, asked

Torzilli: "Have you spoken to them since we elected to move

forward and take over?"  (Ex. L 1161.)  It appears from the

record that, notwithstanding Torzilli's actual response (Ex. L

1152), the answer should have been "no" — THCI did not advise

Lakeview of its election to "move forward and take over," and it

is not clear on what legal basis THCI thought itself entitled to

do so.


On the evening of August 27, THCI did send a letter to

Lakeview, by e-mail (Ex. L 1182), that, yet again, appears to be

a study in ambiguity, rather than a direct response to the issues

presented.  THCI (Torzilli) wrote, in part:

> . . . this is to confirm that <u>we are in agreement in</u>
> <u>wanting to plan for</u> the smooth transition of the
> operation of the facilities . . . .

*     *     *

> In an effort to further this process, we would like to
> schedule a conference call tomorrow to discuss with you
> our plans concerning the transition.
>
> In addition we request that you forward the documents
> on the attached list to me no later than Friday, August
> 31st , 2007 [sic] so that we may further advance the
> transition.  We are entitled to these documents
> pursuant to Section 17.2 of the Lease.
>
> *     *     *
>
> As set forth in my letter to Mr. Anton C. Merka dated
> April 16, 2007, all terms and conditions of the Lease
> remain in effect.  [The reference is to the letter
> "reserving rights" with regard to Lakeview's option
> exercise.]

(Ex. L 1182 (emphasis added).)  THCI's letter did not respond to

Lakeview's transition proposal in any substantive way.  It did

not accept or reject, or even acknowledge the offer of an agreed-

upon resolution of the contractual relationship between them and

any pending contract disputes; nothing was said about the

proposed fair-market asset buyout; nothing about the proposed

exchange of mutual releases; and nothing about continuing to

retain Lakeview as an interim manager during a less time-

pressured transition.


Moreover, although THCI now asserts that Lakeview's e-mails

constituted either a "termination" of the Lease or a

"repudiation" of its obligations under the Lease, nothing in

THCI's letter purported to recognize or accept an asserted

"repudiation" by Lakeview.  Nothing in the letter purported to
recognize an offer by Lakeview to "terminate the Lease early" —
i.e., the Lease as extended by the option exercise — and no words
used suggested that THCI was accepting such an offer and agreeing
to rescission.  To the contrary, THCI declared that "all terms
and conditions of the Lease remain in effect," a position
entirely inconsistent with acceptance of an early termination
offer and equally inconsistent with acceptance of a repudiation.

THCI's August 27 letter, once again, told Lakeview very
little about its position with regard to the contractual
relationship.  It was consistent with THCI's implicit message
that Lakeview would not be permitted to occupy or operate the
leased premises after expiration of the Fixed Term.  The letter
did suggest a substantive, perhaps positive, response to
Lakeview's latest offer, in that it requested a conference call
on the next day "to discuss with you our plans concerning the
transition."  Attached to the letter was a lengthy and detailed
list of documents and information THCI wanted produced by August
31, "so that we may further advance the transition."  Torzilli
added that "We are entitled to these documents pursuant to
Section 17.2 of the Lease."

Lakeview had little reason to think that THCI's August 27
letter rejected its transition proposal — it was neutral — and it

contemplated a substantive discussion in a follow-up telephone conference the next day.  During that call, representatives of THCI said directly that there would be no buyout.  Lakeview's principals testified that they were stunned by this revelation and insisted on speaking to THCI's principals to confirm that rejection and its implication — that THCI anticipated simply taking over operation of the facilities.  A telephone conference with THCI's principals was scheduled for the next day, August 29.  That evening, August 28, Lakeview's then legal counsel wrote to THCI:

> As you know, Lakeview has provided you with written notice of our intent to extend the Lease.  Your subsequent refusal to either extend the Lease at its current rental or to take the steps necessary to determine the new rental amount was and continues to be a material breach of Section 1.4 of the Lease.  We hereby provide you with notice of the breach and your opportunity to cure the same.  In the event you fail to cure the default, the Lessee will be entitled to exercise all available remedies under the Lease and at law and in equity.

Counsel's cover e-mail, transmitting that letter, was somewhat curious in that it arguably confused the purpose and intent of the attached formal letter.  Counsel wrote:

> Notwithstanding the attached letter, and subject to its obligations under applicable law, Lakeview will cooperate with the Lessor in the transition of the facilities to a new Lessee.  Thank you.

(Ex. L 1194.)

26

But THCI could not reasonably think the cover e-mail did anything but acknowledge (from Lakeview's perspective) the still-possible contract resolution as Lakeview had proposed, while formally reserving Lakeview's own contract breach claims, should the relationship not be amicably resolved.  The next day, August 29, THCI principals finally confirmed, in the scheduled telephone call, that there would be no buyout, no mutual releases, no interim management agreement, and that, figuratively if not literally, THCI actually anticipated that Lakeview would just "throw them the keys" of its multi-million dollar health-care facility operations that generated approximately $2 million in profits for Lakeview each year.

Even Lakeview's principals understood THCI's position at that point.  Lakeview would not be allowed to occupy or operate the facilities after September 30, 2007, in accordance with the extended Lease; THCI expected that Lakeview would "transition out," notwithstanding its exercise of the option to extend the Lease; and Lakeview would relinquish its contractual rights and its business without a murmur and without an exchange of mutual releases or an agreement of any kind.  Indeed, THCI would likely initiate a suit to recover for alleged breaches of contract, particularly with respect to the claimed Additional Rent arrearages.

Lakeview was not so inclined.  When its offer to terminate the Lease relationship on the terms it proposed was finally rejected by THCI's principals, Lakeview's legal counsel promptly notified THCI, on the next day (August 30), that Lakeview stood on its contractual rights to the extended term, as provided for in the Lease, and that THCI should cease activity that interfered with its rights of possession and operation.  This litigation followed.

## Discussion

### Did Lakeview Effectively Exercise
### Its Unilateral Right to Extend the Lease Term?

The first issue of importance is the current contractual relationship between the parties.  Essentially, THCI asserts that Lakeview did not effectively extend the Lease term for two reasons.  First, it says the written notice provided by Lakeview was ambiguous because it only declared an "intent" to exercise the option, but did not adequately communicate the fact of exercise.  Second, THCI says that Lakeview was not entitled to exercise its option under the Lease because it was in a continuing default status with respect to Additional Rent owed.

### Ambiguity

In its March 16 letter exercising the option Lakeview wrote: "Pursuant to Section 1.4 of the above-referenced Lease . . .

Lessee intends to extend the term of the Lease for an additional five-year period."  (Ex. L 833.)  The letter referred to the option provisions of the Lease; was in writing; gave notice of its intent to "extend the term;" was not conditional; referred to "continuing our relationship with you;" and, to avoid any issue or doubt about the matter, the letter invited THCI to contact Lakeview "[s]hould any further notice of Lessee's intent to extend the term of the Lease be required."

Not surprisingly, THCI's own internal correspondence confirmed that it had no doubt about the meaning or effect of Lakeview's March 16 notice.  (See Ex. L 834.)  So, Lakeview clearly meant to exercise its option, effectively communicated notice of that exercise as required by Article 1.4 of the Lease, and the notice was understood by THCI as intended.  While THCI expected that it might contest that exercise at some point, on grounds that Lakeview was in default with regard to Additional Rent, there was no misunderstanding on THCI's part that Lakeview had exercised its option.  THCI's post-litigation claim that the March 16 notice was ambiguous because it was carelessly drafted — using the phrase "intends to exercise" rather than "hereby exercises" — is both implausible under the factual circumstances and legally unsustainable.

An option is an irrevocable continuing offer of a contract by the optionor, that the optionee can accept according to its terms.  Whether an optionee has validly accepted an option turns on the optionee's objective manifestation of intent.  Generally, whether an option has been validly exercised is determined by "ascertain[ing] the intent of the parties in light of the language used and the surrounding circumstances."  Loose v. Brubacher, 549 P.2d 991, 996 (Kan. 1976).  When the option clause is silent regarding the manner of exercise, no particular form or notice is essential — all that is required is that the optionee notify the optionor of the decision to exercise it prior to its date of expiration.  See id. (quoting Reger v. Sours, 34 P.2d 996, 999 (Kan. 1957)).

While there may well be particular factual circumstances in which use of the phrase "intends to" would prove inadequate to exercise an option, it is generally accepted that use of the phrase "intends to" in a notice is sufficient to convey that an option has been exercised.  See, e.g., In re Millyard Rest., Inc., 110 B.R. 103 (Bankr. D.N.H. 1990) (assuming unequivocal declaration by Lessee of an "intent to renew" lease term and obligate itself to rental obligation for the next five years under lease, constituted valid exercise of an option to extend); First Nat'l Bank of Chicago v. Valley Liquors, Inc. (In re Valley Liquors, Inc.), 103 B.R. 961, 968 (Bankr. N.D. Ill. 1989)

(written notice of intention to exercise option amounted to exercise of the option — "Unless the option itself specifies further action to exercise the option . . . the option can be exercised by merely giving notice of intention."); McDonald's Corp. v. Lebow Realty Trust, 888 F.2d 912, 914 (1st Cir. 1989) (notice of intent to exercise option to purchase effectively exercised the option); Southeast Cinema Entm't, Inc. v. P.B. Realty, Inc., 585 F. Supp. 2d 754, 767–68 (D.S.C. 2008) (where option does not specify the manner in which it is to be accepted, it can be accepted by optionee's giving notice of intent to exercise the option); Getty Ref. & Mktg. Co. v. Zwiebel, 604 F. Supp. 774 (D. Conn. 1985) (assuming option to extend lease by "giving written notice to that effect" was effectively exercised by optionee's giving "notice of intent to exercise").

Here, THCI's own assessment (Ex. L 834) was accurate, and the court finds, both as fact and as a matter of law, that, under the circumstances, Lakeview's March 16 letter unconditionally, clearly, and unambiguously exercised the option to extend the Lease term.  The objective manifestation of the words used and THCI's own understanding establish that there was a meeting of the minds with respect to Lakeview's exercise of that option, if not the validity of that exercise due to a continuing default.

31

Moreover, if THCI had any doubt about the clarity, meaning, or intent of Lakeview's notice, it, in good faith, should have promptly responded to Lakeview's invitation to "contact us at your first convenience,"  "[s]hould any further notice of Lessee's intent to extend the term of the Lease be required." (Ex. M 8.)

**Continuing Lease Default as a Bar to the Option's Exercise**

THCI next asserts that the Lease term was not extended because a Lease Default had occurred and was continuing when the option was exercised.  In support of that position THCI points to that provision of Article 1.4 that states ". . . so long as no Lease Default (as hereinafter defined) shall have occurred and be continuing, Lessee is hereby granted the right to extend the Fixed Term of this Lease . . . ."

The short answer to THCI's "continuing default" objection to the option's exercise is straightforward:  THCI is equitably estopped by its conduct from invoking that bar.

The Lease Default that THCI says had "occurred and was continuing" at the time Lakeview exercised its option was Lakeview's failure to pay Additional Rent in the full amount

32

due.[5]  Lakeview had not been calculating the Additional Rent
using the Lease definition of Gross Revenues for many years, so,
in THCI's view, it was in a perpetual state of default under the
Lease.  THCI also points out, correctly, that, under the terms of
the Lease, failure to notice a default with regard to rent owed
does not waive THCI's right to collect rent arrearages, and that
no notice of default or opportunity to cure is required under the
Lease with regard to arrearages in rent.

The trial evidence established that, as early as 2001, THCI
was well aware that Lakeview was calculating Additional Rent
differently than prescribed by the terms of the Lease documents.
(See, e.g., Testimony of Warren Cole, Tr. Vol IV, pp. 163–164.)
Nevertheless, THCI continued to accept rental payments, including
Additional Rent as calculated by Lakeview, without declaring a
default or taking steps to resolve the issue by agreement or
legal process.

Instead, both THCI and Lakeview let the matter sit —
essentially agreeing to disagree about whether Lakeview was
correctly calculating the amount due.  As noted earlier, when

---

[5]  THCI also mentions, in passing, Lakeview's alleged
failure to maintain appropriate insurance as required under the
Lease as a Lease Default precluding the option's exercise.  But
prior notice of that alleged default was not given to Lakeview,
and, in any event, that claim is subject to the same estoppel
analysis as the Additional Rent claim.

Lakeview exercised its option to extend the Lease term, THCI responded (a month later, on April 16, 2007), not by declaring the option exercise invalid due to the existence of a continuing Lease Default based on its Additional Rent calculations over the past six years, but by merely "reserve[ing] all rights with respect to that letter and Lessee's rights to extend the Lease." (Ex. L 870.)  By then, of course, the time period during which the option had to be exercised had closed.  Lakeview had no opportunity at that point to get the matter finally resolved. Nor, did it have the opportunity to cure its (alleged) default, as implicitly contemplated by Section 1.4 of the Lease.  A default must be "continuing," to bar exercise of the option, which presupposes awareness of the asserted default claim and failure to cure (or resolve) that claimed default.

Under these factual circumstances, THCI was obligated, by the covenant of good faith and fair dealing implied in every contract, to inform Lakeview, before the option period expired, that it considered the option not subject to valid exercise due to an identified continuing default.  THCI could have, and should have disclosed its position while Lakeview still had an opportunity to cure or resolve the asserted default.  Had THCI given notice of its default claim — after it was told in November of 2006 that Lakeview hoped to exercise the option, or at the latest when Lakeview sent notice of its exercise on March 16,

34

2007 — Lakeview could have cured by paying the claim, or might
have made an acceptable offer in compromise of the claim, or
might have successfully sued to stay the option exercise period
on equitable grounds while a court resolved the Additional Rent
calculation dispute, and, if it was resolved against Lakeview, it
might have obtained a reasonable time to cure.  That is,
Lakeview, if advised of THCI's assertion of a continuing default
and its position that exercise of the option would be, and was,
invalid, could have taken steps to protect its valuable interest
in its leasehold rights.  THCI's failure to inform Lakeview of
its position induced a false sense of security on Lakeview's part
with respect to the option's exercise while the time in which it
could have cured any defect ran out.

Deliberately choosing to remain silent about its intent to
invoke a continuing default as a bar to the option's exercise,
for the very purpose of springing the default as a "trump" after
Lakeview's opportunity to cure was gone (see Ex. L 754), is
conduct fairly characterized as inequitable, and violative of the
covenant of good faith and fair dealing.

Equity will not countenance such conduct.  While the
"punctillio of an honor the most sensitive"[6] is not the governing

---

[6]  In the classic case of Meinhard v. Salmon, 164 N.E. 545,
546 (N.Y. 1928), then Judge Cardozo noted that trustees, at

standard in the world of commercial leasing, still, there are minimum standards of fair dealing.  It has been said that "[c]ontract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper."  Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 280 (7th Cir. 1992).  On the other hand, "while a commercial party does not have to act with benevolence towards an opposing party, it cannot behave inequitably."  Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 399–400 (N.J. 2005).

Like most jurisdictions, New Hampshire recognizes the doctrine of equitable estoppel.  The doctrine's purpose is "to ensure justice where otherwise there would be none."  Hilco Prop. Servs., Inc. v. U.S., 929 F. Supp. 526, 540 (D.N.H. 1996). Application of the doctrine is necessarily flexible; it "rests largely on the facts and circumstances of the particular case." Goodwin R.R., Inc. v. State, 128 N.H. 595, 600 (1986) (citation omitted); see also Olszak v. Peerless Ins. Co., 119 N.H. 686, 690 (1979).  Moreover, "[e]stoppel doctrine clearly permits silence to stand for acquiescence in proper circumstances."  Ostler v.

least, are held "to something stricter than the morals of the marketplace."  He defined that stricter standard as "[n]ot honesty alone, but the punctilio of an honor the most sensitive is then the standard of behavior."  Id.

Codman Research Group, 241 F.3d 91, 95 (1st Cir. 2001) (citations
omitted); Concrete Constructors, Inc. v. Harry Shapiro & Sons,
Inc., 121 N.H. 888, 892-93 (1981) ("An estoppel may arise . . .
from silence or inaction as well as from words or actions.").

THCI remained silent about a material matter — its claim of
a continuing default as a bar to the option's exercise — when it
had a duty to speak.  When Lakeview notified THCI in November of
2006 that it hoped to exercise its option (the time in which to
exercise and/or cure any default was already running), THCI said
nothing.  When Lakeview sent THCI notice of its exercise of the
option to extend on March 16, 2007, some two weeks before the
option exercise window closed, THCI still said nothing about any
objection it had to the option's exercise.  THCI said nothing at
all about invoking the Additional Rent issue as a bar to the
option's exercise until one month later, on April 16.  And, even
then it did not clearly state that it deemed the option's
exercise to be invalid; it merely "reserved its rights."

THCI's conduct was not unlike that found to warrant
application of the equitable estoppel doctrine in Capital
Commercial Properties, Inc. v. Ames Realty II, Inc. (In re Ames
Department Stores, Inc.), 288 B.R. 339 (Bankr. S.D.N.Y. 2003),
and the similar cases cited therein.  In that case, the Lessor
also claimed that the Lessee's exercise of an option to extend a

Lease was invalid.  The Lessor objected on grounds that the

notice was written on stationary, not of the Lessee, but of the

Lessee's corporate parent.  Id. at 341.  After carefully

considering the equitable principles involved, including that an

obligation to communicate relevant facts — to speak — can arise

in equity when silence will convey a false impression, the court

noted that "estoppel by conduct occurs where one party 'caused

the other party to occupy a more disadvantageous position than

that which he would have occupied except for that conduct.'"  Id.

at 351 (quoting Stanley's Cafeteria, Inc. v. Abramson, 306 S.E.2d

870, 873 (Va. 1983)).  The court held the Lessor estopped from

denying the validity of the option's exercise for two independent

reasons, the second being pertinent here:

> The second [reason] arises from the Landlord's
> failure to raise the alleged defect in exercise of the
> option in the period from the time of option exercise,
> in December 2000, and the deadline for exercising it,
> some six weeks later.  Throughout this time, the
> Landlord knew, if it mattered, that Ames Realty II was
> the Tenant-of-record, and knew the manner of exercise
> of the option.  But it did not speak, and its failure
> to speak deprived the Ames Defendant . . . the
> opportunity to cure the alleged defect, if it was one,
> which easily could have been done with the stroke of a
> pen."

In re Ames Dep't Stores, 228 B.R. at 352 (footnote omitted); see

also In re Q.T., Inc., 118 B.R. 47, 50–51 (Bankr. E.D. Va. 1990)

(holding that landlord's silence despite ample opportunity to

voice objections to option exercise before tenant relied on it

estopped landlord from objecting); <u>In re Circle K Corp.</u>, 127 F.3d
904, 909 (9th Cir. 1997); <u>Adelman v. Applefield</u>, 203 N.Y.S. 2d
602, 606-07 (N.Y. Mun. Ct. 1959) (landlord estopped from
interposing otherwise valid objection to exercise of option to
extend lease where he remained silent about defect until after
the option exercise period expired).

As in <u>Capital Commercial Properties</u>, this court also "is
unwilling to countenance a party's effort to seize upon an
alleged defect when timely protest, if indeed it was sincere,
would have provided an opportunity to cure any and all alleged
defects" in the option's exercise.  288 B.R. at 354.
Accordingly, based upon its deliberate silence regarding its
known objections to Lakeview's option exercise and its remaining
silent while the option exercise period ran its course and
expired, thereby both inducing a false sense of security in
Lakeview with regard to the option's effective exercise, and
THCI's consciously depriving Lakeview of the time and ability to
cure any alleged defect or otherwise seek appropriate and timely
remedies, THCI is equitably estopped from denying the valid
exercise by Lakeview of its option to extend the Lease term.
That is so, whether the asserted deficiency was in the nature of
an ambiguity arising from Lakeview's use of the phrase "intends
to," or a continuing default arising from the Additional Rent
calculation dispute, or THCI's claimed (but argued only in

passing) continuing breach related to insurance coverage
requirements under the Lease.

Lakeview's exercise of its option to extend the Lease term
was valid and effective.  The Lease term was extended for the
first five-year period, as provided in Article 1.4 of the Lease.

### Did Lakeview Repudiate or
### Anticipatorily Breach the Extended Term Lease?

Under New Hampshire law, a contract is repudiated, or an
anticipatory breach occurs, when a party either unmistakably
repudiates his obligations through words or voluntarily disables
himself from performing them before the time for performance.
LeTarte v. West Side Dev., LLC, 151 N.H. 291, 294 (2004) (citing
9 A. Corbin, Contracts § 959 (interim ed. 2002)).  Anticipatory
repudiation requires an unequivocal expression of intent to
forego performance in the form of a definite and final
communication.  Enterasys Networks, Inc. v. Clarendon Nat'l Ins.
Co., No. 04-cv-27-SM, 2006 WL 2482779, at *5 (D.N.H. Aug. 29,
2006) (quoting Md. Cas. Co. v. W.R. Grace & Co., No. 88 Civ. 2613
(JSM), 1996 WL 306372, at *1 (S.D.N.Y. June 7, 1996)).  Whether a
party has anticipatorily breached a contract or has abandoned it
is generally regarded as a question of fact.  See, e.g., Wolff &
Munier, Inc. v. Whiting-Turner Contracting Co., Inc., 946 F.2d
1003, 1008 (2d Cir. 1991).

After exercising its option to extend, Lakeview still anticipated a new agreement with THCI — one that would result in either a new and more favorable Lease arrangement, or a "buy out" that would completely wrap up and resolve the contractual relationship between them.  Lakeview was open to either alternative, but hopelessly misapprehended THCI's quite different expectations.  Even after THCI's "reservation of rights" letter of April 16, in which THCI proposed a new arrangement involving a dramatic rent increase and payment by Lakeview of disputed Additional Rent for the previous six years (roughly $1.4 million), Lakeview's principals still did not seem to recognize the reality of the situation.

Viewing the communications and conduct of the parties in context, as described earlier in detail, the court is persuaded that Lakeview did not intend to, and did not, manifest a clear, unequivocal, and final intent to repudiate the extended Lease.  Nor did it offer to terminate the extended Lease relationship between it and THCI.  THCI's contrary interpretation of that correspondence is not persuasive.

Lakeview's e-mails of May 2 (Ex. L 875) and August 17 (Ex. L 962) put THCI on fair notice that Lakeview was ready, willing, and able to perform under the Lease as amended by its option exercise.  Though Lakeview's principals seemed to think,

41

erroneously, that THCI's acceptance or approval of the exercised option was required for the term to be extended, THCI understood that it was not.  THCI's failure to respond to Lakeview's representation — call it an offer to perform its obligations under the contract — was reasonably understood by Lakeview as THCI's refusal to allow Lakeview to perform.

At that point, on August 23, in the two e-mails sent to THCI (Exs. L 1027, L 1029), Lakeview made a different proposal. Rather than continuing its efforts to obtain more favorable terms under the Lease, Lakeview unambiguously offered to resolve the contractual relationship between them on specified terms:  full cooperation in transferring licenses, permits, etc., as called for under the Lease when a term expires (Article 17); exchange of mutual releases; a fair-market buyout by THCI of Lakeview's business; and Lakeview's willingness to serve as interim manager for a fee while the complicated transfer of operations occurred. THCI's response, by letter on August 27, was at best ambiguous.

It cannot be said that Lakeview's assertion that it was willing to perform under the extended Lease amounted to a "repudiation" in any way of its contractual obligations.  It is also difficult to find that THCI "accepted" repudiation of the extended Lease — an extended Lease that it tacitly claimed, and now explicitly claims, did not exist.

Lakeview's final offer was rejected by THCI principals on August 29, when it was confirmed that THCI would not buy out Lakeview's business, nor exchange mutual releases, nor engage Lakeview as an interim manager while either a new Lessee was found or THCI assumed responsibility for operation of the facilities.  But, Lakeview's e-mails constituted neither a repudiation of the Lease, nor an offer of rescission.  Instead, those e-mails set forth a proposal to end the contractual relationship on terms:  an exchange of mutual releases and THCI's purchase of Lakeview's interest in the business.  On August 29, however, THCI rejected Lakeview's offer in settlement or resolution of the contractual relationship.

Even if one could plausibly argue that Lakeview's proposal constituted a clear and unequivocal declaration that it would not perform, or a clear and unequivocal offer to terminate the contract between the parties, still, THCI neither effectively accepted that repudiation (or, alternatively, that offer to terminate), nor did it detrimentally rely on any repudiation. Between August 23 and August 30, THCI increased its level of activity with respect to an anticipated transition, but that anticipated transition was just part of the overall offer by Lakeview.  THCI presumably knew that it was not going to accept Lakeview's offer.  If THCI was relying on anything, it was relying on its own expectation — unfounded and completely

43

fanciful — that Lakeview was actually going to "throw them the keys" (Ex. L 961) to a multi-million dollar enterprise in exchange for little more than a "Thanks for your cooperation in a smooth transition."

Here, I find as fact and as a matter of law, that the words used by Lakeview in its communications to THCI on May 2, August 17, August 22, and August 23, did not repudiate, or purport to repudiate its obligations under the extended lease.[7]  To the contrary, those communications plainly sought the opportunity to perform under the terms of the extended lease.  Alternatively, should THCI refuse that performance, Lakeview offered to terminate the contractual relationship between the parties on stated terms — which offer was plainly rejected by THCI.

---

[7]  To the extent THCI might have been genuinely perplexed or uncertain about Lakeview's desire to perform its contractual obligation, it was entitled to seek adequate assurances from Lakeview.  The New Hampshire Supreme Court has recognized the availability, and utility, of the "right to demand adequate assurances" in situations where repudiation may have occurred but the promisee is uncertain.  That right is expressly provided for under the Uniform Commercial Code (see N.H. REV. STAT. ANN. ("RSA") § 382-A:2-609(1)), and its application in general contract law is "closely related to the duty of good faith and fair dealing in the performance of the contract . . . . a duty that has long been an integral component of our common law of contracts . . . ."  McNeal v. Lebel, 157 N.H. 458, 463 (2008), (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 251, cmt. a at 277; citing Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (1989)).

### The Counter—Claim for Arrearages in Rent

THCI filed a counterclaim for Additional Rent owed, based upon the discrepancy between Lakeview's calculations using Gross Revenues as the term is understood under GAAP, rather than Gross Revenues as the term is defined in the Lease.

THCI had no reason to think, when it purchased the property, that Additional Rent under the Lease was being calculated by Lakeview in any manner other than as the pertinent documents disclosed.  Before purchasing the properties and succeeding to the Lessor's obligations, THCI performed adequate due diligence inquiries, which included obtaining a Tenant Estoppel Certificate (Ex. F 6) from Lakeview, as Lessee.  The Estoppel Certificate affirmatively represented that there were no known default conditions under the Lease, and, significantly, that the contractual arrangement between Lakeview and the then Lessor (Meditrust) was as described in the Lease attached to the certificate.  The attached Lease was the Lease at issue.  No appended document disclosed a change in how Additional Rent was calculated, or that a new or amended definition of Gross Revenues was in effect, and nothing in any of the appended documents referred to a side agreement or written or oral estoppel agreement amending the Lease provisions related to Additional Rent calculations.  The Estoppel Certificate clearly stated that "[t]he methodology for computing Additional Rent is set forth in

45

Section 3.1.2 of the Lease."   THCI was plainly entitled to rely on that document.

Lakeview's affirmative representations in the Estoppel Certificate were material, and Lakeview knew that THCI would reasonably rely upon those affirmative representations.   An "estoppel certificate" is a common device used in real estate transactions.   It consists of a "[a] signed statement by a party (such as a tenant or mortgagee) certifying for another's benefit that certain facts are correct, as that a Lease exists, that there are no defaults, and that rent is paid to a certain date. A party's delivery of this statement estopps that party from later claiming a different state of facts."   <u>K's Merch. Mart, Inc. v. Northgate Ltd. P'ship</u>, 835 N.E.2d 965, 971 (Ill. App. Ct. 2005) (quoting Black's Law Dictionary 572 (7th ed. 1999)).

The purpose of an estoppel certificate is, as the term suggests, to assure a purchaser, like THCI, that the Lessee will not later make claims that are inconsistent with the representations in the certificate, upon which the prospective purchaser is entitled to rely.   <u>See</u> <u>id</u>.   "Estoppel certificates are important and useful devices to preserve and enhance the marketability of commercial property.   They are widely used in commercial real estate transactions."   <u>Id</u>.; <u>see also</u> <u>Plaza Freeway Ltd. P'ship v. First Mountain Bank</u>, 96 Cal. Rptr. 2d 865

46

871–72 (Cal. Ct. App. 2000); <u>Liberty Prop. Trust v. Day–Timers,</u>
<u>Inc.</u>, 815 A.2d 1045, 1052 (Pa. Super. Ct. 2003) (lessee was
equitably estopped from asserting an oral modification of the
lease where it clearly denied the existence of any such
modification in an estoppel certificate); <u>Va. Highland Assocs. v.</u>
<u>Allen</u>, 330 S.E.2d 892, 895–96 (Ga. Ct. App. 1985).

Lakeview might have thought it had an agreement with the
prior owner to change the rent calculation, by amending the
definition of Gross Revenues, and it may actually have had one
(though evidence of such an agreement was sparse).  But, Lakeview
carelessly failed to present any documentation of that change to
THCI when it certified the terms of the Lease, and it did not
disclose any such oral or written agreement in any other way
before THCI purchased the property.  Lakeview is reasonably
charged with knowing that THCI would rely upon its affirmative
representations in the estoppel certificate in deciding whether
to purchase the properties.  Under such circumstances, Lakeview
must be held to the terms it represented were in effect,
including the Additional Rent calculation formula as set out in
the Lease that Lakeview itself certified as controlling the
relationship between it and the prior owner.  Lakeview is
estopped from claiming a different state of facts now, after THCI
materially changed its position in reliance upon the certificate.

Lakeview points to Prime Financial Group, Inc. v. Masters,
141 N.H. 33 (1996), as supporting its argument that the
Additional Rent calculation was, nevertheless, amended by conduct
with respect to THCI.  The argument proceeds as follows.  Even if
THCI is not bound by the agreement with Meditrust, still,
Lakeview argues, THCI is now bound by its own conduct in the
intervening years.  THCI effectively agreed to the amended
Additional Rent calculation, Lakeview says, or at least it is now
estopped by conduct from challenging it, because THCI knew in
2001 that Lakeview was calculating the Additional Rent
differently than called for by the Lease terms, yet THCI
continued for years thereafter to accept those Additional Rent
payments as Lakeview calculated them.

Prime Financial does not help Lakeview.  That decision
recognizes that a provision in a contract requiring any waiver or
modification of its terms to be in writing, as this Lease does,
cannot limit the parties' own ability to orally alter the
contract by agreement in the future.  Id. at 37.  Contracting
parties retain the power to alter, vary, or discharge a contract
by subsequent agreement, even an oral agreement, notwithstanding
a limitation in the contract itself.  Id.  In Prime Financial, a
jury determined that the parties to an equipment lease agreed to
waive a contractual provision requiring assignments of the lease
to be in writing, and that the party later objecting to an

48

assignment had also agreed to the assignment, as indicated by its conduct.  The objecting party, the lessor, had been given written notice of the assignment, and was asked to concur.  <u>Id</u>. at 35-36. The lessor remained silent, but accepted future payments on the equipment lease from the assignee alone, and without protest. <u>Id</u>. at 35.  The court recognized that the parties had effectively agreed by conduct to waive the "amendments only in writing" requirement, and, that the lessor had also agreed to the assignment.  <u>Id</u>. at 37.

Lakeview reads <u>Prime Financial</u> far too broadly, as holding that a lessor who accepts commercial lease payments it knows were calculated differently from the manner prescribed in the lease, and who has brought that discrepancy to the attention of the lessee, and has expressed its disagreement with the calculation, and even advised the lessee from time to time during the lease term of the growing dollar amount it believes the lessee owes in arrearages, has, nevertheless, effectively consented to an unwritten lease amendment modifying the rent obligation, as well as waived any provision in the lease itself requiring amendments to be in writing.  The court disagrees.

THCI's acceptance of Lease payments, while maintaining that they were not properly calculated, cannot reasonably be construed as suggesting agreement to the major amendment Lakeview seeks to

impose.  As noted in THCI's post-trial brief, THCI had legitimate
business reasons not to aggresively press the issue, given other
priorities, its interest in maintaining the beneficial business
relationship between the parties, and the potential for general
agreement on a number of issues, including that one, at some
later time.  In addition, THCI was entitled to rely on those
provisions of the Lease that permitted it to accept less than the
rent due without waiving its right to recover arrearages later.

In this case, the evidence does not establish that the
parties either agreed to waive the Lease provision requiring
amendments to be in writing, or, having done that, agreed to a
"Gross Revenues" definition different than that specified in the
Lease.  And, although the court has held that THCI is estopped to
invoke Lakeview's underpayment of rent as a bar to Lakeview's
exercise of its option to extend, THCI is <u>not</u> barred from
pursuing its right to recover rent arrearages.

Accordingly, THCI is entitled to judgment on its
counterclaim for Additional Rent arrearages.  Lakeview owes THCI
Additional Rent in an amount equal to the difference between the
Additional Rent as properly calculated under the Lease terms and
as in fact calculated by Lakeview.[8]

---

[8]  The precise amount owed is a matter of performing a
series of mathematical calculations.  The result ought to be

## Statute of Limitations

THCI's cause of action for Additional Rent owed accrued when
it became aware of Lakeview's different calculation method and
its detrimental effect on THCI's rent receipts.  <u>Gen.
Theraphysical, Inc. v. Dupuis</u>, 118 N.H. 277 (1978).  THCI knew of
both the different calculation method used by Lakeview and its
detrimental effect in 2001, yet it chose to sit on its rights.
Suit was not brought to recover Additional Rent until the
counterclaim was filed on October 14, 2007.

In New Hampshire, "[t]o be timely, a contract claim must be
brought within three years of when it arose."  <u>Coyle v. Battles</u>,
147 N.H. 98, 100 (2001) (citing RSA 508:4, I).  "[A] cause of
action . . . arises once all the necessary elements are present .
. . .  In the case of a contract action, it would be when the
breach occurs."  <u>Coyle</u>, 147 N.H. at 100 (quoting <u>Bronstein v. GZA
GeoEnvironmental</u>, 140 N.H. 253, 255 (1995)).  Here, Lakeview
breached the Lease in 2001, when it first made a rental payment
to THCI that was not in accordance with the Additional Rent
provisions in the lease, as affirmed in the Estoppel Certificate.
The three-year limitations period begins to run as to each
Additional Rent payment as it becomes due.  <u>Gen. Theraphysical,</u>

---

undisputed.  If the parties cannot agree on the amount due,
however, the court will entertain a motion to reopen the case and
resolve the issue, likely by appointing an expert, or special
master, at the parties' expense.

Inc., supra; Pierce v. Metro. Life Ins. Co., 307 F. Supp. 2d 325
(D.N.H. 2004) ("New Hampshire follows the 'universal rule that
when an obligation is to be paid in installments the statute of
limitations runs only against each installment as it becomes due
. . . .'").

Wisconsin law, on the other hand, prescribes a six-year
limitations period for actions in contract.  Wis. Stat. § 893.43.
While in this case the New Hampshire limitations period would
generally apply, New Hampshire law does not require blind
adherence "to a traditional rule whose application would be
unwise or unfair in a particular case."  Keeton v. Hustler
Magazine, Inc., 131 N.H. 6, 19 (1988).  Applying New Hampshire's
choice-of-law principles, and recognizing that the parties
consciously provided in the Wisconsin Lease that its terms would
be governed by Wisconsin law, it is appropriate to treat the two
Leases separately for statute of limitations purposes.  It would
be unwise and unfair to impose New Hampshire's three-year
limitations period with respect to breaches of the Wisconsin
lease.  New Hampshire has no interest in what limitations period
applies to a breach of a Wisconsin contract, performed in
Wisconsin, and under which the parties have agreed to be bound by
Wisconsin law.  Wisconsin on the other hand, has a strong
interest in enforcing its policy decisions.

Therefore, THCI is entitled to recover breach of contract
damages for Additional Rent due and owing, but only during the
three-year period extending back from the date of filing its
counterclaim with respect to the New Hampshire Lease, and
extending six years back with respect to the Wisconsin Lease, and
from filing of the counterclaim to the present.  (Obviously,
Lakeview is obligated, as well, to calculate and pay Additional
Rent throughout the extended term as provided for in the Lease.)

### The **Mentor** Sale

By agreement, the parties also brought late competing
supplemental claims related to an effort by Lakeview to sell its
New Hampshire business operations to Mentor National Healthcare,
LLC ("Mentor") in the fall of 2007.  The parties did not pursue
these claims at trial, and little discussion is required
(generally breach of contract, tortious interference, etc.).  The
proposed sale never progressed beyond the early discussion stage,
and would not have progressed beyond that stage given this
dispute and the litigation initiated by Lakeview in September of
2007.  Any potential purchaser would, without a doubt, have
insisted on an authoritative resolution of the validity of the
option's exercise before even considering moving forward with
serious discussions, and that issue was legitimately contested.

53

Lakeview was in default when it exercised the option and but for the court's application of the equitable estoppel doctrine, it had nothing of real value to sell (the right to occupy and operate the facilities is the only business asset Mentor could conceivably have been interested in purchasing).

THCI did not unreasonably withhold consent to a sale to Mentor (which had not yet been agreed upon) given its substantial claims to Additional Rent arrearages, and Lakeview did not unreasonably seek to sell its business, even though, for all practical purposes, that business was unmarketable pending resolution of this litigation.

### The Consumer Protection Act Claims

Neither party is entitled to prevail on its respective state law claims brought under New Hampshire's Consumer Protection Act. To a degree, both parties behaved in a manner that is easily subject to criticism, and each party's behavior was instrumental in creating the milieu of misunderstanding, miscommunication, and misapprehension of their respective rights and responsibilities under the Lease relationship.  There is enough rascality here on each side to preclude finding that either side was imposed upon unduly.  Even so, the rascality on neither side rises to the level necessary to support a Consumer Protection Act claim.  See State v. Sideris, 157 N.H. 258, 263 (2008) ("under the rascality

test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to be rough and tumble of the world of commerce.") (citation omitted).

### Summary

The court, as trier of fact, recognizes that THCI has capably argued an entirely different factual interpretation of the evidence presented.  It is clear that neither Lakeview's nor THCI's factual theory of the case is free from inconsistency with at least some of the evidence, or the occasional self-contradiction.  Both sides made statements and engaged in behavior decidedly inconsistent with the perspective each later sought to impose on the circumstances as a whole.  As is often the case, the truth lies somewhere in between.  Overall, the reality is that Lakeview's imprecision and ineptness, combined with THCI's unresponsiveness and studied avoidance of clear communication combined equally to create this confusing factual situation, one that was easily avoidable.  Each party was maneuvering to attain a commercial goal, and neither party seemed willing to, or capable of, doing so with candor and clarity.

Having heard the witnesses and having carefully reviewed and considered the evidence presented, I have found that Lakeview's perspective, in general, and as qualified above, is more persuasive.  The contradictions and evidentiary flaws in THCI's

position are greater, and, in the end, I am persuaded that THCI well knew that Lakeview had neither repudiated nor abandoned the Lease, while Lakeview naively dreamed of a profitable sale in lieu of an extended term under the Lease.

The court's ruling are summarized as follows.

Lakeview validly exercised its option to extend the Lease term.  THCI is equitably estopped by conduct from challenging the validity of the option's exercise.

Lakeview did not repudiate the extended Lease contract but, recognizing THCI's tacit refusal to permit Lakeview's performance under the extended contract, and finally recognizing the futility of pursuing a new landlord–tenant relationship, it expressed its intention to fully comply with its obligations under the extended Lease.  Lakeview did offer to terminate the Lease as extended (and the contractual relationship between the parties) but only on specified terms.  That offer was rejected by THCI.  At that point, Lakeview took stock of its situation, and, through legal counsel, put THCI on unmistakable notice that it insisted on its contractual rights under the extended Lease.

THCI is entitled to recover properly calculated Additional Rent consistently with the applicable statutes of limitations

periods as described.  Lakeview's petition for a declaratory
judgment (Count I) that it has not defaulted on the Lease, and,
is entitled to extend it, is granted in part and denied in part.
Lakeview was in default, but THCI is estopped from invoking any
continuing default due to its own inequitable conduct.
Lakeview's option exercise was effective when the extension
window closed without a substantive objection from THCI.

I find in favor of THCI on Lakeview's breach of contract
claim (based upon THCI's refusal to acknowledge extension of the
Lease) (Count II).  THCI had no contractual obligation to
specifically "accept" or acknowledge Lakeview's extension, beyond
performing its own obligations under the Lease.  This case was
already in litigation by the time the Fixed Term expired, and a
state court had issued an injunction preserving the status quo.
THCI had no opportunity to breach or not breach its contractual
obligation to permit Lakeview to occupy and operate the leased
premises, and it made no clear, unequivocal, or final statement
of an intent not to perform sufficient to constitute an
anticipatory repudiation, though Lakeview reasonably construed
its silence and conduct as indicating it would not permit
Lakeview to continue as tenant beyond September 30.

Lakeview's second contract claim (Count III), based on
THCI's alleged breach of Lakeview's right to quiet enjoyment of

the leased property, also fails.  To be sure, THCI officials made visits to the facilities, and prepared for an anticipated transition of operations at the end of the Fixed Term.  But, those visits and inquiries were invited by Lakeview's own imprecise and unclear statements and conduct as much as by THCI's strategies.  Lakeview itself anticipated transitioning operations, subject to an acceptable deal to terminate the contract relationship.  Thus, THCI's activity did not breach any obligation to provide quiet enjoyment of the premises.

Count IV, Lakeview's claim for tortious interference with business relations, is based on the same conduct alleged in Count III, and it, too, fails for the same reasons.

Finally, Lakeview's Consumer Protection Act claim, asserted in Count V, fails, inter alia, because THCI's conduct did not rise to the requisite level of rascality.

Lakeview is not entitled to judgment on any of its three supplemental claims (breach of contract, tortious interference with business relations, and violation of the Consumer Protection Act) arising from the potential sale of its business assets to Mentor.  That potential sale was not a realistic possibility under the circumstances, so Lakeview was not harmed by any of the alleged conduct on which those claims are based.

Turning to THCI's counterclaims, THCI is entitled to relief on its breach of contract claim asserted in Count I.  Lakeview failed to pay the full amount of Additional Rent due to THCI. Lakeview's obligation to pay rent is a contractual duty and to the extent its breach also breached other agreements between the parties, THCI is also entitled to judgment on the breach of contract claim stated in Count II.

Because THCI's claim for breach of the implied covenant of good faith and fair dealing merely restates its breach of contract claims, and because THCI has proved no conduct by Lakeview of the sort described in Centronics, supra, 132 N.H. 133, THCI is not entitled to judgment on Count III.

Regarding Count IV, THCI's Consumer Protection Act claim, THCI is not entitled to judgment because Lakeview's conduct did not rise to the requisite level of rascality.

THCI's unjust enrichment claim, Count V, fails because it is based upon an erroneous premise — that Lakeview has been wrongfully in possession of the leased property since the expiration of the Fixed Term, and has been obligated to pay rent as a holdover tenant at sufferance.  Lakeview remains a tenant by virtue of its valid extension of the Fixed Term.

Finally, because Lakeview is entitled to possession of both the New Hampshire and Wisconsin properties, it is not liable, under Wisconsin law, for failure to vacate the Wisconsin property.  Accordingly, THCI is not entitled to judgment on Count VI of its counterclaims.

THCI is also not entitled to judgment on its supplemental counterclaims arising from Lakeview's preliminary discussions with Mentor.  Supplemental Counts I (a request for injunctive relief), II (breach of the Lease), III (the second claim given that number, for tortious interference with prospective economic advantage), IV (civil conversion), and V (misappropriation and unfair competition) all are based on the erroneous premise that Lakeview has been, and is, a holdover tenant with narrowly circumscribed rights to the leased property.

THCI's first claim labeled Count III (breach of a stock pledge agreement) is based on the premise that Lakeview's failure to fully perform its obligations under the Lease (i.e., failing to vacate the property at the end of the Fixed Term and failing to pay the full rent) precluded it from taking any action to transfer or assign stock it had pledged to THCI.  Under the circumstances found, Lakeview had no obligation to vacate the property, and, even if Lakeview did breach the stock pledge agreement by engaging in negotiations with Mentor while in

60

continuing default on its obligation to pay the full rent due, THCI has proven no damages resulting from any breach of the stock pledge agreement.  Accordingly, THCI is not entitled to relief on that claim.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.  The court notes that the parties have submitted literally hundreds of requests for findings and conclusions, many of which are argumentative and convoluted.  It is well settled, however, that the court "does not have to make findings on every proposition put to it by the parties."  Applewood Landscape & Nursery Co. v. Hollingsworth, 884 F.2d 1502, 1503 (1st Cir. 1989) (quoting Morgan v. Kerrigan, 509 F.2d 580, 588 n.14 (1st Cir. 1974)).  Rather, the findings simply need be "sufficient to indicate the factual basis for the ultimate conclusion."  Kelly v. Everglades Drainage Dist., 319 U.S. 415, 422 (1943) (per curiam).  If either party believes that additional findings of fact and conclusions of law are necessary to support the court's rulings, it may submit a written request for (a reasonable number of) additional findings and conclusions within fifteen days of the date of this Memorandum Decision.  Any other requests for findings of fact or rulings of law submitted by the parties and not expressly or implicitly granted in the body of this opinion are hereby denied.

Judgment will enter upon expiration of the allowed period in which to request supplemental findings if none are requested, or after ruling if requests are made.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

March 30, 2009

cc:  Christopher H. M. Carter, Esq.
     Daniel M. Deschenes, Esq.
     Ovide M. Lamontagne, Esq.
     Jonathan M. Shirley, Esq.
     Leigh S. Willey, Esq.